# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## AIKEN DIVISION

| | |
|---|---|
| LATAVEIA ALLEN, *on behalf of herself and all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>    Defendant. | Case No.: 1:24-cv-07476-CMC (lead case) |
| NORMAN BLACK, *on behalf of himself and all others similarly situated,*<br><br>        Plaintiff,<br><br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>        Defendant. | Case No. 1:24-cv-07519-CMC |
| GE-QUOIA WHITFIELD, *on behalf of herself and all others similarly situated*,<br><br>        Plaintiff,<br><br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>        Defendant. | Case No. 1:24-cv-07537-CMC |

| | |
|---|---|
| CHINTANIA FRIERSON, *on behalf of herself and all others similarly situated*,<br><br>       Plaintiff,<br><br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>Defendant. | Case No. 1:24-cv-07538-CMC |
| LUCIUS POUND, *on behalf of himself and all others similarly situated*,<br><br>       Plaintiffs,<br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>Defendant. | Case No. 1:24-cv-07581-CMC |
| CHRISTOPHER CUMMINGS *on behalf of himself and all others similarly situated*,<br><br>       Plaintiff,<br><br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>       Defendant. | Case No: 1:24-cv-07586-CMC |

| | |
|---|---|
| OSCAR ORTIZ, *on behalf of himself and all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>Defendant. | Case No.: 1:24-cv-07669-CMC |
| ROSEMARY ORTIZ, *on behalf of herself and all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>Defendant. | Case No.: 1:24-cv-07671-CMC |
| VINCENT CERRATO, *on behalf of himself and all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>    Defendant. | Case No.: 1:24-cv-07684-CMC |

| | |
|---|---|
| THERESA MCGRIER, *on behalf of herself and all others similarly situated*,<br><br>       Plaintiff,<br><br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>       Defendant. | Case No.: 1:24-cv-07695-CMC |
| SHANNON DUNN, *on behalf of herself and all others similarly situated*,<br><br>       Plaintiff,<br><br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>       Defendant. | Case No.: 1:25-cv-00210-CMC |
| RICKY CHASE, *on behalf of himself and all others similarly situated*,<br><br>       Plaintiff,<br><br>v.<br><br>SRP FEDERAL CREDIT UNION,<br><br>Defendant. | Case No.: 1:25-cv-00312-CMC |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION OR ALTERNATIVELY DISMISS PLAINTIFFS' CONSOLIDATE COMPLAINT**

## I.     INTRODUCTION

Defendant SRP Federal Credit Union ("Defendant" or "SRP") is a South Carolina-based credit union that offers financial services and products to hundreds of thousands of consumers throughout the United States. To perform these services, Defendant collects and maintains consumers' personally identifiable information ("PII"), including their names, Social Security numbers, financial account information, and dates of birth. PII is valuable, and foreseeable harm to consumers occurs when this valuable commodity is taken by cybercriminals.

Defendant's computer network was accessed by cybercriminals between September 5 and November 4, 2024 (the "Data Breach"). Because Defendant failed to secure the PII of over 240,000 of its customers, this sensitive information is now in the possession of notorious cybercriminals, Nitrogen Ransomware Group, and is for sale on the dark web. As a result, Plaintiffs have suffered real and actual injuries and are at imminent risk of further harm, including identity theft. Defendant did not notify its customers of the Data Breach for approximately three months after it occurred, and Plaintiffs have spent substantial time and energy attempting to monitor their credit and identity, as well as mitigating the damage caused by Defendant's inadequate cybersecurity.

Defendant contends that Plaintiffs are required to arbitrate these claims but fails to put forth evidence that each Plaintiff agreed to the arbitration terms. Instead, Defendant relies on its membership application form which references its Membership Agreement, which in turn contains an arbitration provision. But this is far too attenuated to demonstrate affirmative agreement to forfeit Plaintiffs' right to sue in this Court and, regardless, the purported arbitration agreement is unconscionable. Defendant's motion to compel arbitration and motion to dismiss should be denied.

## II.     FACTUAL BACKGROUND

### A.  SRP Collects and Promises to Safeguard Plaintiffs' PII

In the course of providing financial services, SRP collects highly sensitive PII from its

1

consumers—including but not limited to names, dates of birth, Social Security numbers, and financial account information. ECF No. 19, Consolidated Complaint ("CCAC") ¶¶26, 31. SRP then stores and maintains that PII, without having implemented reasonable cybersecurity safeguards or protocols to protect it. *Id*. ¶¶5, 10, 29. When it collects and maintains that PII, SRP recognizes it has a duty to safeguard it and keep it confidential, agreeing to protect the data using reasonable means. *Id*. ¶¶26-29. Plaintiffs trusted SRP would appropriately protect their PII and would not have provided their PII to SRP if they knew it would not implement the necessary precautions to secure it. *Id*. ¶¶10, 239-240. In fact, SRP did not follow industry standard practices in securing the PII it maintained and in training its IT or data security employees to prevent, detect, and stop breaches of its systems. *Id*. ¶¶5, 183. As a result, SRP exposed its consumers' PII, making it an unguarded target for criminals. *Id*. ¶9.

### B. SRP Violates its Duties

Between September 5 and November 4, 2024, Defendant's internal network was infiltrated by cybercriminals, who accessed and acquired the highly sensitive PII of Defendant's current and former clients. *Id*. ¶¶1, 21, 34. Concerningly, Nitrogen Ransomware Group claimed credit for the attack, posting confidential consumer information on its data leak page at a purchase price of $400,000. *Id*. ¶¶38-40. To back-up its claims, Nitrogen provided samples of the stolen documents and data, which it claimed to include full names, dates of birth, addresses, Social Security numbers, account numbers, and credit ratings of consumers. *Id*. ¶ 39. In total, the PII of at least 240,000 individuals was compromised in the Data Breach. *Id*. ¶¶1, 35. However, SRP failed to notify victims of the Incident until December 12, 2024 — three months after the Data Breach began. *Id*. ¶4. SRP's delay in notifying victims made its consumers more vulnerable to identity theft as they did not know to guard themselves by monitoring their accounts or credit reports to prevent

unauthorized use of their PII. *Id*. ¶¶6, 174.

### C. Plaintiffs Suffered Harm Following SRP's Data Security Incident

Plaintiffs have suffered, and will continue to suffer, harm following the Data Breach. *Id*. ¶165. Plaintiffs have already experienced multiple instances of fraud following the Data Security Incident. For example, in the aftermath of the Data Security Incident, Plaintiffs McGrier, Chase, and Black all suffered fraudulent charges on their financial accounts with SRP, forcing them to spend time remediating these charges or closing their accounts. *Id*. ¶¶90, 104, 118. Plaintiffs Dunn and Ortiz were forced to spend money on credit monitoring services to protect themselves from the risks posed by the Data Breach, particularly in the wake of Plaintiff Dunn receiving a credit alert that an unauthorized actor attempted to access her accounts. *Id*. ¶¶ 76, 155, 158. And, Plaintiffs experienced an increase in spam and scam phone calls, text messages, and emails purporting to be from their banks, further suggesting that their PII is now in the hands of cybercriminals. *Id*. ¶¶79, 93, 107, 121, 135, 161. Plaintiffs have spent and will continue to spend considerable time and effort monitoring their accounts to guard themselves against the present and continuing threat that SRP's Data Breach poses. *Id*. ¶¶76, 91, 105, 119, 133, 147, 159. As a result of the Data Breach, Plaintiffs not only suffer from an imminent risk of identity theft but have also suffered a decrease in value of their PII. *Id*. ¶165.

### III.     LEGAL STANDARDS

#### A. Motion to Compel Arbitration

"'[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 18 (2002). Accordingly, before compelling an unwilling party to arbitrate, courts apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944

(1995). Courts may invalidate arbitration agreements based on general contract law defenses such as unconscionability, which is frequently applied to invalidate biased arbitration agreements. *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (observing that language in arbitration agreements that effectively deprives a claimant of statutory remedies violates public policy and is unenforceable). Defendant must meet the heavy burden applicable at the summary judgment stage of showing, as a matter of law, that Plaintiffs agreed to arbitrate. *Rowland v. Sandy Morris Fin. & Estate Planning Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021).

### B. Fed. R. Civ. P. 12(b)(1)

When a complaint is attacked under Rule 12(b)(1) for lack of standing, the allegations are taken as true and "construe[d] in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). "[W]hen a defendant challenges a plaintiff's standing, we analyze the challenge differently depending on the stage of litigation at which the challenge is brought and the substance of the defendant's arguments." *Overbey v. Mayor of Balt.*, 930 F.3d 215, 227 (4th Cir. 2019). At the pleading stage "general factual allegations of injury resulting from the defendant's conduct" are enough to support standing. *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992))). If a complaint's allegations plausibly support the plaintiff's standing to sue, a motion to dismiss for lack of jurisdiction should be denied. *Wikimedia Found.*, 857 F.3d at 208.

### C. Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Blackbaud, Inc.,* No. 3:20-mn-02972-JMC, 2021 WL 2718439, at *4 (D.S.C. July 1, 2021). "'[D]etailed factual allegations are not required, but the Rule does call for sufficient factual

matters, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555).

## IV.    Plaintiffs Are Not Subject to Mandatory Arbitration.

### A. No Valid Arbitration Agreement was Formed with Plaintiffs.

"There is . . . no public policy—federal or state— 'favoring' arbitration." *Palmetto Constr. Grp. v. Restoration Specialists, LLC*, 432 S.C. 633, 639, 856 S.E.2d 150, 153 (2021). Arbitration agreements are treated like all other contracts and must be reviewed for validity under state contract law. *Kaplan*, 514 U.S. at 944; *Casarotto*, 517 U.S. at 686-87. Under South Carolina law, a valid contract requires (1) an offer, (2) acceptance of the offer, and (3) the mutual exchange of benefits called "consideration." *Sauner v. Pub. Serv. Auth. of S.C.*, 354 S.C. 397, 406, 581 S.E.2d 161, 166 (2003). There must be a meeting of the minds between the parties on all essential and material terms of the agreement. *Hughes v. Edwards*, 265 S.C. 529, 220 S.E. (2d) 231 (1975). Any modification of a written contract must satisfy the same requisites. *Bishop Realty and Rentals, Inc. v. Perk, Inc.*, *105 292 S.C. 182, 355 S.E. (2d) 298 (S.C. App. 1987), *cert. denied*, 293 S.C. 538, 362 S.E. (2d) 26 (1987). A party seeking to compel arbitration must show that these elements are met. *Wilson v. Willis*, 426 S.C. 326, 336, 827 S.E.2d 167, 173 (2019). Defendant has utterly failed to meet its burden to show that a valid arbitration agreement was formed with Plaintiffs.

South Carolina courts have repeatedly struck down agreements formed under circumstances where, as here, a defendant failed to show that the plaintiffs assented to its terms. The Supreme Court of South Carolina recently considered whether an employee who began work one month earlier agreed to arbitrate her claims when her employer sent a notice of its arbitration program, the plaintiff clicked that she "acknowledged" the notice, the plaintiff was then able to view the entire arbitration agreement, and the employee did not opt-out of the arbitration program

but continued to work notwithstanding that the arbitration agreement stated that failure to opt-out and continuation of employment constitute mutual acceptance of the arbitration agreement. *Lampo v. Amedisys Holding, LLC et al.,* Case No. 2022-001362, __ S.C. __, slip op. at 2-3 (Mar. 5, 2025).[1] Reversing the court of appeals, the South Carolina Supreme Court held in a published opinion:

> Lampo's decision to continue working and not opt out does not in any way indicate her willingness and desire to enter and be bound by the Dispute Resolution Agreement. Before August 6, Lampo worked according to the terms of the initial July 8 employment agreement. After August 6, there is simply nothing to indicate she did anything different that could be considered a manifestation of assent to the August 6 offer. She simply continued to perform the job duties for which she was already under contract to be paid. Without some manifestation of assent to the new terms of employment set forth in the Dispute Resolution Agreement—the mutual promises of arbitration—there can be no acceptance.

*Id*. at 8 (citing *Electro-Lab of Aiken, Inc. v. Sharp Constr. Co. of Sumter*, 357 S.C. 363, 369, 593 S.E.2d 170, 173 (Ct. App. 2004)).

Defendant's argument is even more attenuated than in *Lampo*, hinging on the assertion that its members signed a "membership application form" which incorporated the membership agreement, which Defendant, "in its sole discretion, may change . . . at any time without notice except as expressly required by applicable law." ECF No. 30-10 ¶ 11. A close look at Defendant's evidence shows that its argument to compel arbitration is meritless.[2]

According to SRP, the arbitration provision was first made available to SRP's members in the June 2021 membership agreement. *See* ECF No. 30-10 ¶ 16. Defendant vaguely asserts that notice of the changes to the membership agreement was sent by email or mail to all active members, except that notice was sent to Plaintiff Chase in 2021 and to Plaintiff Allen in 2023. *Id.* ¶ 18. However, Defendant *never* alleges that it sent Plaintiffs a copy of the membership

---

[1] Available at https://www.sccourts.org/media/opinions/advSheets/no102025.pdf, pages 20-32, (last visited June 17, 2025).
[2] Should the Court give Defendant's "evidence" any weight, Plaintiffs request leave to take discovery related to whether Plaintiffs agreed to arbitrate their claims (they did not).

agreement—instead, Defendant asserts that the membership agreement is available through the "members-only online portal" and that hard copies are available "on request at SRP offices." *Id.* ¶ 13.[3] As an initial matter, this fails to establish that Plaintiffs received adequate notice of the arbitration provisions and, in any event, is clearly insufficient under *Lampo* to bind Plaintiffs to the arbitration provisions. Indeed, six out of seven Plaintiffs became SRP members years, or decades, before the arbitration provision was implemented: Plaintiff Black in 1996; Plaintiff McGrier in 2008; Plaintiff Ortiz in 2014; Plaintiff Whitfield in 2015; Plaintiff Chase in 2019; and Plaintiff Dunn in 2019. *Id.* ¶¶ 20-25. Defendant does not even have a signed copy of an application for Plaintiffs Black or McGrier, and Defendant acknowledges that the application form did not incorporate the membership agreement until 2014. *Id.* ¶ 8. Further, the signed application forms do not mention an arbitration provision or otherwise alert Plaintiffs that by signing the application, they are agreeing to arbitrate all claims. *See id.* ¶¶ 20-21; *see, e.g.* ECF No. 30-9 (Plaintiff Allen's membership application). Yet, Defendant insists that Plaintiffs agreed to arbitrate because they did not opt out of terms that were never communicated to them. This is insufficient to compel Plaintiffs to arbitrate. Plaintiffs did not manifest assent to arbitrate by remaining silent and not opting out. *Electro-Lab of Aiken, Inc.*, 357 S.C. 363, 369, 593 S.E.2d 170, 173 (acceptance requires "manifestation of assent to the terms thereof."). Not only was there no formal "acknowledgement" of the new arbitration provisions as in *Lampo*, but there is no evidence that Plaintiffs were ever given a copy of the arbitration provisions or aware that they even existed. *Foster v. Walmart, Inc.*, 15 F.4th 860, 864 (8th Cir. 2021) (terms must be "reasonably conspicuous" to provide notice).

Courts have repeatedly concluded that agreements under the circumstances alleged here

---

[3] Defendant's declaration is wholly lacking in factual detail concerning the notice it sent of the "changes" to the membership agreement and whether Plaintiffs had online portal accounts. In sum, Defendant never asserts that Plaintiffs received or saw the arbitration provisions.

are invalid. *See*, *e.g.*, *Marshall v. Georgetown Mem'l Hosp.*, No. 2:21-cv-02733-RMG-JDA, 2022 WL 5434226, at *6 (D.S.C. July 7, 2022) (affirmed in Case No. 22-2010, 4th Cir. Aug. 13, 2024) (finding that an application form failed to provide reasonable notice of an arbitration provision or show assent to arbitrate because merely submitting an application form does not "manifest assent to an agreement or acceptance of any terms and conditions" to arbitrate); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938–39 (4th Cir. 1999) (affirming a trial court's determination that an arbitration agreement supplemental to an employment contract was illusory where the employer could unilaterally change or eliminate arbitration); *Brown v. Ryan's Family Steak Houses, Inc.*, No. 2:03–2582, slip op. at 10–11 (D.S.C. Feb. 27, 2004) (denying motion to compel arbitration under South Carolina law because the plaintiff did not knowingly and voluntarily consent to arbitration). Here, there is no evidence that Plaintiffs were properly offered, accepted, or received consideration for the arbitration provisions and, therefore, the Court should find them invalid.

**B.  The Purported Arbitration Agreements are Unconscionable.**

Courts can also find an arbitration agreement unenforceable if it is unconscionable. *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 305 (4th Cir. 2001). In South Carolina, unconscionability is "the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 24–25, 644 S.E.2d 663, 668 (2007). Relevant considerations include "fundamental fairness of the bargaining process," "loss of the right to a jury trial," the "parties' relative sophistication," and "the conspicuousness of the clause." *York v. Dodgeland of Columbia, Inc.*, 406 S.C. 67, 86-87 (2013) (citing *Simpson*, 644 S.E.2d at 668-70). Here, Plaintiffs lacked a meaningful choice to the purported arbitration agreements because there is no evidence that

8

Plaintiffs ever saw the arbitration provisions buried in the membership agreements, Plaintiffs lost substantive rights to a jury trial and to bring a class action, and the provisions were imposed unilaterally without clear notice. *See id.* (finding that plaintiff had no meaningful choice because she lost her right to a jury trial and mandatory statutory remedies and there was a significant disparity between the parties' relative bargaining power and sophistication); *see also Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 668 (6th Cir.2003) (*en banc*) (explaining that there must be a knowing and voluntary waiver of substantive rights).

Moreover, arbitration agreements are substantively unconscionable where they would effectively prevent plaintiffs from pursing relief for their claims. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617 (1997) (citation omitted). In assessing unconscionability, courts should determine whether the arbitral forum is an adequate substitute to litigation, "*i.e.*, a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." *Bradford v. Rockwell Semiconductor Systems, Inc.*, 238 F.3d 549, 556 (4th Cir. 2001) (explaining that the pertinent question is whether the claimant is effectively prevented from vindicating their rights or whether the arbitral forum provides a "full and fair opportunity" to vindicate those rights.).

In similar cases, where plaintiffs brought a class action to vindicate rights for thousands of people that individually would be of *de minimis* value, courts have routinely found the arbitration agreements unenforceable. *See, e.g., Kristian v. Comcast Corp.*, 446 F.3d 25, 54-55 (1st Cir. 2006) (the "implicit ban on spreading across multiple plaintiffs the costs of experts, depositions, neutrals'

9

fees, and other disbursements'—forces the putative class member 'to assume financial burdens so prohibitive as to deter the bringing of claims'") (citation omitted); *Lozada v. Dale Baker Oldsmobile, Inc.*, 91 F. Supp. 2d 1087, 1104 (W.D. Mich. 2000) ("the waiver of class remedy contained in the arbitration clause . . . violates the requirements of reasonableness standards of *Rembert* and is substantively unconscionable.").

Here, too, Plaintiffs' data breach claims would be of minimal value individually, and Defendant left to each of its members the costs of filing a claim, attorney's fees, subpoenas, depositions, etc. *See* ECF No. 30-1 at 23. The complexity of data breach cases and their attendant lawyer's and expert fees, combined with the potentially minimal recovery for an individual plaintiff, necessarily means that the only meaningful route for the thousands of victims here is via class action. *See Wong v. T-Mobile USA, Inc.*, No. 05-73922, 2006 WL 2042512, at *5 (E.D. Mich. July 20, 2006) ("[T]he right to a class action is . . . certainly necessary" where plaintiffs would have no incentive to pursue arbitration for an individual claim that would be less than "the value in time and energy required to arbitrate a claim."). Because Defendant's arbitration agreements would effectively prevent Plaintiffs from pursuing any relief for their *de minimis* individual claims in this case, the agreements are unconscionable and should not be enforced. *Bradford*, 238 F.3d at 554 ("[I]t is undisputed that fee splitting can render an arbitration agreement unenforceable where the arbitration fees and costs are so prohibitive as to effectively deny the employee access to the arbitral forum.") (citing *Green Tree Fin. Corp.—Alabama v. Randolph,* 531 U.S. 79, 90 (2000)).

## V.     Plaintiffs Have Established Article III Standing.

To establish standing under Article III, Plaintiffs must show (i) an "injury in fact" that is concrete and particularized, (ii) the injury is "fairly traceable" to the defendant's challenged conduct, and (iii) the injury is likely to be redressed by a favorable decision. *Lujan,* 504 U.S. at

560–61. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* at 561.

### A.    Plaintiffs have Suffered Concrete Injuries-in-Fact

#### 1.    Plaintiffs Suffered Actual Misuse of their PII.

Plaintiffs have alleged concrete and cognizable injuries resulting from SRP's conduct, including unauthorized charges, attempts to access accounts by unauthorized users, publication of PII on the dark web, and phishing attempts and spam associated with the stolen financial information and contact information. Plaintiff McGrier, suffered a number of fraudulent charges on her SRP accounts, forcing her to open a new account and get a new bank number and card. CCAC ¶ 90. Plaintiff Black was forced to close his SRP account and opened another account due to the numerous fraudulent charges on his SRP account. *Id.* ¶ 118. Plaintiff Allen had to place a freeze on her credit and changed her account passwords. *Id.* ¶ 132. Plaintiff Ortiz received a credit alert that an unauthorized actor attempted to access her accounts, causing her to spend $32 per month on credit monitoring. *Id.* ¶¶ 155, 158. Further, following the Data Breach, Plaintiffs began suffering a significant increase in spam calls and text messages posing as the bank or another financial institution. *Id.* ¶¶ 79, 93, 107, 121, 135, 161.

Plaintiffs have not merely alleged that their PII was included in the Data Breach but have made specific allegations relating to misuse. Allegations such as these "bring the actual and threatened harm out [of] the realm of speculation and into the realm of sufficiently imminent and particularized harm to satisfy the injury-in-fact requirement for Article III standing" for the Plaintiffs. *Gordon v. Zeroed-In Tech., LLC*, No. CV 23-3284-BAH, 2025 WL 936415, at *6 (D. Md. Mar. 26, 2025) (citing *In re Marriott Int'l, Inc., Customer Data Security Breach Litig.*, 440 F.

Supp. 3d 447, 459 (D. Md. 2020)).

2. <u>Imminent Risk of Identity Theft is a Concrete and Cognizable Injury.</u>

The Supreme Court has held that even intangible injuries like the threat of future harm may be concrete. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotations omitted). Thus, cognizable injuries include a substantial risk that the harm will occur, even if it is not "literally certain." *Clapper v. Amnesty Int'l, Inc.*, 568 U.S. 398, 414 n.5 (2013).

SRP disregards analogous Fourth Circuit precedent regarding the increased risk of identity theft resulting from a data breach and relies on *Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017). But *Beck* is inapposite because there the personal data at issue "had been stolen, but the information contained therein had not been misused." *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 622 (4th Cir. 2018) (citing *Beck*, 848 F.3d at 271–75) (distinguishing *Beck* because the *Hutton* plaintiffs alleged their stolen PII was misused to apply for and open unauthorized credit card accounts.). The *Hutton* plaintiffs suffered identity theft and credit-card fraud such that there was "no need to speculate on whether substantial harm will befall" them—it already had. *Id*. at 621–22. "At a minimum," these allegations established an "imminent threat of injury" sufficient to confer standing. *Id.* This case here is analogous to *Hutton* and *Gordon* and distinguishable from *Beck*, because here Plaintiffs *do* allege their PII has already been misused. *See*, *e.g.*, CCAC ¶¶ 76, 79, 90, 93, 104, 107, 118, 121, 132, 135,155, 161. Here, names and Social Security numbers, among other PII, are the same information as that involved in *Hutton*, where fraudulent account applications were deemed sufficiently concrete to confer standing. 892 F.3d at 622.

Additionally, Plaintiffs have alleged injury-in-fact in the form of future impending risk of

12

identity theft. *See Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 889 (11th Cir. 2023) (evidence of "some misuse of class members' data" indicates harm of future identity theft is "certainly impending"). In data breach cases where hackers have intentionally stolen PII, courts have found plaintiffs face a substantial risk of a certainly impending injury because "a primary incentive for hackers is 'sooner or later to make fraudulent charges or assume those consumers' identities.'" *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 967 (7th Cir. 2016). Thus, "[w]here a data breach targets [PII], a reasonable inference can be drawn that the hackers will use the victims' data for the fraudulent purposes alleged in Plaintiffs' complaints." *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x. 384, 389 (6th Cir. 2016). The reasonable inference here is that all Plaintiffs face a substantial and impending risk of identity theft and have standing.

### 3. Lost Privacy Is a Concrete and Cognizable Injury.

Because "[i]ntrusions upon personal privacy were recognized in tort law and redressable through private litigation," Plaintiffs' loss of privacy is a cognizable injury regardless of potential monetary damages arising therefrom. *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019). Here, Plaintiffs have alleged examples of their PII *already being misused* in the Data Breach's aftermath, including by unauthorized charges to their accounts, fraudulent attempts to access their accounts, and an increase in spam calls and texts following the Data Breach. CCAC ¶¶ 76, 79, 90, 93, 104, 107, 118, 121, 132, 135, 155, 161. These allegations of misuse are concrete injuries-in-fact that confer Article III standing. *Hutton*, 892 F.3d at 622; *In re Marriott*, 440 F. Supp. 3d at 460–61; *Bank of La. v. Marriott Int'l Inc.*, 438 F. Supp. 3d 433, 439–40 (D. Md. 2020) ("[A]ctual identity theft in the form of unauthorized credit card charges" constitutes injury-in-fact for standing.); *Solomon v. ECL Grp., LLC*, No. 1:22-cv-526, 2023 WL 1359662, at *4 (M.D.N.C. Jan. 31, 2023) (misuse in the form of "an increase in spam texts, spam calls, and spam emails" is

13

injury-in-fact).

    4. <u>Lost Time, Costs, and Efforts to Mitigate the Breach's Consequences Are Concrete and Cognizable Injuries.</u>

Despite that Plaintiffs have been forced to expend considerable time, effort, and costs mitigating the Data Breach's consequences, (CCAC ¶¶ 76, 77, 90, 91, 104, 105, 118, 119, 132, 133, 146, 147, 158, 159), SRP, while conceding lost time damages have occurred, argues those damages are insufficient as the Plaintiffs may be "worrying about something that may never come to pass." ECF No. 29 ("MTD") at 18. Defendant even admits that multiple Plaintiffs have had to purchase credit monitoring (CCAC ¶ 76, 158) but argues that these purchases could have been made before the Data Breach occurred. MTD at 18. A basic reading of the operative complaint indicates that these purchases were made "as a result of the Data Breach." CCAC ¶ 76, 158.

Defendant once again ignores that Plaintiffs' PII *was* already misused. *Hutton*, 892 F.3d at 622 ("Because the injuries alleged by the Plaintiffs are not speculative, the costs of mitigating measures to safeguard against future identity theft . . . readily show[ed] sufficient injury-in-fact."); *see also Clapper*, 568 U.S. at 441 n.5 ("[W]e have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm."). Thus, Plaintiffs' mitigation efforts constitute Article III injuries.

    5. <u>Emotional Harm is a Concrete and Cognizable Injury.</u>

Plaintiffs allege the Data Breach has caused them to suffer and experience feelings of anxiety, stress, fear, and frustration, and distress about how the Data Breach will impact them in the future. CCAC ¶¶ 77, 91, 105, 119, 133, 147, 159. Emotional injuries like these are injuries-in-fact conferring Article III standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 436 n.7 (2021) ("[A] plaintiff 's knowledge that he or she is exposed to a risk of future physical, monetary, or reputational harm could cause its own current emotional or psychological harm."). In arguing

14

Plaintiffs' emotional injuries are not concrete, SRP again relies on unpersuasive cases that do not involve the actual misuse of stolen PII and are therefore inapposite. MTD at 12–13 (citing *Beck*, 848 F.3d at 272; *Stuart v. Kyocera AVX Components Corp*., No. 6:23-CV-06087-JDA, 2025 WL 745903, at \*9 (D.S.C. Mar. 7, 2025)). This case involves emotional injuries tied to other concrete harms like loss of privacy and impending identity theft, which Plaintiffs have suffered and will continue to suffer due to the Breach. These are injuries-in-fact. *Hutton*, 892 F.3d at 622.

      6.   <u>Diminished Value of PII Is a Concrete and Cognizable Injury.</u>

In *In re Marriott*, the court acknowledged the value of PII and held the diminished value of compromised PII is a concrete injury based on allegations that the defendant collected and paid to analyze that information and that the plaintiffs' exposed PII had already been misused. 440 F. Supp. 3d at 461–62. Plaintiffs allege the same here. *See, e.g.*, CCAC ¶¶ 75, 89, 103, 117, 131, 145, 157, 165. These allegations establish Plaintiffs' injuries-in-fact from their PII's diminished value. *See also Gordon*, 2025 WL 936415, at \*7 (citing *Smallman v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175, 1191 (D. Nev. 2022) (finding diminished value of PII to be a cognizable theory of damages where data breach "devalued Plaintiffs' PII by interfering with their fiscal autonomy").

SRP cites to *Stuart*, 2025 WL 745903, at \*9, and *Andrews v. Prisma Health*, No. 6:23-CV-03153-JDA, 2024 WL 3861384, at \*10 (D.S.C. Aug. 16, 2024), two inapposite cases in which no actual misuse was alleged in the complaints. Here, misuse has been thoroughly alleged and Plaintiffs adequately pled that the PII SRP collected is considerably valuable and remains of high value on the black market and dark web. CCAC ¶ 167. Based upon applicable case law and allegations related directly to the value of the PII, Plaintiffs have standing to assert a claim due to the lost value of their Private Information.

      7.   <u>Spam Calls, Texts, and Emails</u>

In the data breach context, federal courts have widely recognized phishing and spam communications as a concrete injury. *Baldwin v. Nat'l W. Life Ins. Co.*, No. 2: 21-CV-04066-WJE, 2021 WL 4206736, at *4 (W.D. Mo. Sep. 15, 2021) ("spam phone calls and emails can qualify as an injury"); *Hays v. Frost & Sullivan, Inc.*, No. SA-23-CV-01490, 2024 WL 4052741, at *3 (W.D. Tex. Aug. 16, 2024), *R&R adopted*, 2024 WL 4047166 (Sept. 4, 2024) (increased spam communications and publication of personal information on dark web sufficient injury).

Defendant argues that "none of the seven notice letters state that phone numbers or email addresses were potentially involved." MTD at 19. However, Plaintiffs need only demonstrate a plausible connection between the exfiltration of their PII and their increased spam communications. *See Capiau v. Ascendum Mach., Inc.*, No. 3:24-CV-00142-MOC-SCR, 2024 WL 3747191, at *1, 4 (W.D.N.C. Aug. 9, 2024) (information compromised did not include phone numbers or emails, yet plaintiff's increased spam "show[ed] that his PII is being used in a fraudulent manner due to the Ascendum breach. Based on this credible showing of actual misuse, the Court concludes that Capiau has established a concrete and actual injury") (collecting cases).

Plaintiffs explicitly assert *how* the Data Breach caused their increased spam communications, even though their contact information was not included in the PII accessed. CCAC ¶¶ 170-172 (discussing "Fullz" packages, which permit cybercriminals to cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data). Plaintiffs also draw a temporal connection between the Data Breach and their instances of increased spam calls and text messages "following the Data Breach." *See id.* ¶¶ 79, 93, 107, 121, 135, 161. In sum, these allegations are more than sufficient to establish standing.

## VI.    Plaintiffs Adequately Pled Cognizable Injury

SRP cites *no* authority from South Carolina or this Circuit addressing liability in the context

of a data breach. Indeed, Defendant ignores *In re Blackbaud, Inc., Customer Data Breach Litig*., 567 F. Supp. 3d 667 (D.S.C. 2021), where the court held allegations of unauthorized disclosure of PII to cybercriminals, loss of value in PII, risk of future identity theft, out-of-pocket mitigation expenses, and time and money spent to mitigate exposure to identity theft are sufficient to allege cognizable injuries under South Carolina law. *Id.* at 686–87. SRP further ignores other Fourth Circuit data breach cases with similar holdings. *See, e.g., In re Capital One*, 488 F. Supp. 3d 374, 402 (E.D. Va. 2020) ("[A]ctual fraudulent charges, including unauthorized charges on [] accounts, theft of their personal financial information, and costs associated with the detection and prevention of identity theft [are] allegations of damages [] sufficient to survive a motion to dismiss") (citing *Hutton*, 892 F.3d at 613) (finding concrete injury where identity thieves used plaintiffs' information to open credit card accounts); *In re Marriott Int'l, Inc.*, MDL No. 19-md-2879, 2020 WL 6290670, at *4, *24 (D. Md. Oct. 27, 2020) (finding legally cognizable injury where there is either "actual injury of identity theft; or ... a threatened injury based on substantial risk of future identity theft that is sufficiently imminent").

Plaintiffs plead exactly the types of injuries found sufficient in *Blackbaud*, *Hutton*, *Capital One*, and *Marriott*. Here, the Complaint alleges that, as a result of having their PII exposed to unauthorized cybercriminals, multiple Plaintiffs have experienced identity theft in the form of fraudulent charges to their accounts (CCAC ¶¶ 73, 90, 118, 155), have had their stolen PII posted to the dark web (*id.* ¶¶ 38-40, 71, 85, 99, 113, 127, 141, 153), have devoted time and out-of-pocket money in an attempt to mitigate harms from the Data Breach (*id.* ¶¶ 76-7, 90-1, 104, 118, 132, 146, 158), and have been victims of targeted phishing scams that used their PII (*id.* ¶¶ 79, 93, 107, 121, 135, 161). Such allegations are more than sufficient under the authorities discussed above.

Defendant's argument is further misguided since South Carolina courts recognize that

Plaintiffs can recover nominal damages. *See e.g. J & W Corp. of Greenwood v. Broad Creek Marina of Hilton Head*, LLC, 441 S.C. 642, 670 (S.C. Ct. App. 2023) ("The right to nominal damages emerges when a right is violated, regardless of whether general damages can be proven."); *Bergstrom v. Palmetto Health All.*, 358 S.C. 388, 397, 596 S.E.2d 42, 46 (S.C. 2004) ("The law presumes the existence of at least nominal damages for the violation or infringement of a legal right.") (citations omitted). Thus, even though Defendant disputes that the Data Breach caused so-called "cognizable damages," that does not bar Plaintiffs from recovering, even if nominally.

## VII.     Plaintiffs Sufficiently Plead Their Negligence Claim

To state a cause of action for negligence under South Carolina law, a plaintiff must show: "(1) a duty of care owed by the defendant; (2) a breach of that duty by a negligent act or omission; (3) a negligent act or omission resulted in damages to the plaintiff; and (4) that damages proximately resulted from the breach of duty." *Savannah Bank, N.A. v. Stalliard*, 734 S.E.2d 161, 163–64 (S.C. 2012). Plaintiffs have satisfied each of these elements.

### A.     Plaintiffs Sufficiently Allege the Breach of a Relevant Duty.

South Carolina recognizes a "legal duty is that which the law requires to be done or forborne with respect to a particular individual or the public at large." *S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 289 S.C. 373, 376 (S.C. 1986); *Rogers v. Scyphers*, 251 S.C. 128, 134, 161 S.E.2d 81, 84 (1968) (noting "the duty of exercising care to protect another against injury arises a matter of relation and of knowledge of danger"). Indeed, "there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." *Faile v. S.C. Dept. of Juvenile Justice*, 350 S.C. 315, 334 (2002). However, contrary to Defendant's argument, South Carolina recognizes five exceptions to this rule: "1) where the defendant has a special relationship to the victim; 2) where the defendant has a special relationship to the injurer;

3) where the defendant voluntarily undertakes a duty; 4) where the defendant negligently or intentionally creates the risk; and 5) where a statute imposes a duty on the defendant." *Id.* (internal citation omitted).

The first exception applies here. A "[d]uty arises from the relationship between the alleged tortfeasor and the injured party." *Huggins v. Citibank, N.A*., 355 S.C. 329, 333, 585 S.E.2d 275, 277 (2003) (citing to *Booz-Allen & Hamilton, Inc.*, 289 S.C. 373, 346 S.E.2d 324). Plaintiffs have adequately pleaded a duty arose from the special relationship whereby Defendant became a guardian of Plaintiffs' and Class Members' PII. CCAC ¶¶30-33, 199, 210. In collecting and maintaining its members' PII, Defendant agreed and understood it would safeguard the data in accordance with state law and federal law, yet it did not implement reasonable cybersecurity safeguards or policies to protect PII or train its IT or data security employees to prevent, detect, and stop breaches of its systems. *Id.* ¶¶27-29.

As this Court correctly recognized in the *Blackbaud* data breach case, a special relationship exists when the defendant "has the ability to monitor, supervise and control an individual's conduct and when the individual has made a specific threat of harm directed at a specific individual." 567 F. Supp. 3d 667, 681 (quoting *Roe v. Bibby*, 763 S.E.2d 645, 649 (S.C. Ct. App. 2014)). "[I]t is not necessary for the injuring party to have made a threat while under the defendant's control or custody. All that is required to impose a duty to warn is that the defendant knew or should have known of a specific threat made to harm a specific person." *Roe*, 763 S.E.2d at 649. Although this exception did not create a duty in *Blackbaud* (plaintiffs failed to allege defendant had any ability to monitor the conduct of hackers), it applies here where Plaintiffs have alleged Defendant had the ability to monitor, supervise, and control the hackers and their conduct (in the form of policing its IT systems to prevent hacker intrusion), and still negligently failed to do so. CCAC ¶¶5, 52, 179-

19

184. Additionally, Defendant has a special relationship with the injurer because Nitrogen Ransomware group issued a ransom demand to Defendant. *Id.* at ¶39. As such, Defendant had the ability to control the PII secured and stolen by Nitrogen and prevent it from being further disseminated on the dark web. Thus, the first and second exceptions apply here.

The fourth exception also applies because Defendant had a duty to protect Plaintiffs from the criminal conduct of third parties based on Defendant's own negligent conduct in creating the risk by failing to use reasonable security measures. "A common law duty may arise where a defendant creates 'a situation that [it] knew or should have known posed a substantial risk of injury' to a plaintiff." *Blackbaud,* 567 F. Supp. 3d at 682 (finding a duty where plaintiff consumers alleged that defendant cloud software company knew of the risk of cyberattacks and inadequacy of its systems, yet "failed to correct, update, or upgrade its security protections") (citing to *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 688 S.E.2d 125, 130 (2010)).

Here, Plaintiffs have sufficiently pled that Defendant, through its inadequate security measures, negligently exposed their PII and knew or should have known its inadequate security measures posed a substantial risk of injury. CCAC ¶¶54-67; 175-184, 201-205. Despite the foreseeable risks of data breaches, industry standards for financial institutions like Defendant, and Federal Trade Commission (FTC) guidelines, Defendant failed to implement adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII within its possession. *See id*. Defendant contends in its Notice Letter that it will be enhancing its technical security measures and recognizes the actual imminent harm and injury that flowed from the Data Breach, so it encouraged breach victims to "remain vigilant to protect against potential fraud and/or identity theft." *Id.* ¶¶46-47. Additionally, Defendant recognized its duty to implement reasonable cybersecurity safeguards or policies to protect PII, insisting that, despite the Data Breach

20

demonstrating otherwise, it "values and respects the privacy of your personal information." *Id.* ¶48. As such, despite Defendant's acknowledgement of the risk of cyberattack and its expressed acknowledgement of the risk associated with failing to properly safeguard that information, Defendant breached its duty to protect Plaintiffs' and Class Members' PII.

The fifth exception also applies here. Defendant's argument that industry standard and statutes do not impose a duty of care is wrong. "An affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or some other special circumstance." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656–57 (2006) (citing *Elledge v. Richland/Lexington School Dist. Five*, 352 S.C. 179, 186, 573 S.E.2d 789, 793 (2002) ("general rule is that evidence of industry [] standards is relevant to establishing the standard of care in a negligence case"). As such, Plaintiffs sufficiently allege a duty of care owed through industry standards. CCAC ¶¶37, 181-184. Further, Courts in the Fourth Circuit, including this Court, have routinely recognized that a duty is owed by virtue of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See Blackbaud*, 567 F. Supp. 3d at 686, n.15 (citing to *In re Brinker Data Incident Litig.*, No. 3:18-CV-686-J-32MCR, 2020 WL 691848, at *9 (M.D. Fla. Jan. 27, 2020) (plaintiffs may use the alleged violation of the FTCA to support their general negligence claims); *In re Marriott*, 2020 WL 6290670, at *9 (finding Plaintiffs' have sufficiently plead that Defendant owed them a statutory duty to protect them from the actions of third-party hackers by virtue Section 5 of the FTCA). Thus, Plaintiffs may base their negligence claim on Defendant's duty of care owed by industry standards, Section 5 of the FTCA, 15 U.S.C. § 45 and FTC guidelines. CCAC ¶¶ 175-180.[4]

---

[4] Defendant's citation to *In re Blackbaud, Inc. Customer Data Breach Litigation*, No. 3:20-mn-02972-JMC, 2021 WL 3568394, at *11 (D.S.C. Aug. 12, 2021), is wrong because that order does not address the FTCA as creating a general negligence duty. In the subsequent order that Plaintiffs

B.        **Plaintiffs Have Adequately Pled Causation.**

Defendant's argument that Plaintiffs have not adequately plead causation is also incorrect. Defendant's reliance on *Resnick v. AvMed, Inc*. is misplaced. 693 F.3d 1317, 1327 (11th Cir. 2012). Like in *Resnick*, Plaintiffs here alleged a direct nexus between the data breach and the identity theft, pleading that the same sensitive information that was involved in the Data Breach was implicated in the instances of misuse suffered by Plaintiffs. *See id*. Such allegations at the pleading stage are sufficient to survive a motion to dismiss. *See Blackbaud*, 567 F. Supp. 3d at 687 (finding causation where "Plaintiffs plausibly allege that Blackbaud had custody of their Private Information, that Blackbaud's systems were hacked, that these hackers obtained Plaintiffs' Private Information, and that as a result of the Ransomware Attack, they have suffered identity theft and other fraudulent activity.").

Specifically, Plaintiffs Dunn, McGrier, Chase, Black, Allen, and Oritz have alleged that following the Data Breach, they began suffering a significant increase in spam calls, texts, and/or emails posing as their bank or another financial institution. CCAC ¶¶79, 93, 107, 121, 135, 161. Additionally, Plaintiff McGrier alleged she suffered a number of charges on her SRP account, forcing her to open a new account and get a new card. *Id.* ¶90. Plaintiff Chase has flagged multiple unauthorized charges on his accounts associated with SRP. *Id.* ¶104. Plaintiff Black had to close his SRP account and open a new one due to fraudulent changes on his account. *Id.* ¶118. Plaintiff Allen has alleged, following the breach, that she received a dark web notification from her credit and identity theft protection service, Credit Karma. *Id.* ¶127. Also, Plaintiff Whitefield's credit monitoring services indicated that she was a victim of the Data Breach. *Id.* ¶141. Lastly, Plaintiff

---

cite in this response, this Court recognized that violations of the FTCA could support a general negligence claim.

Oritz alleged she received a credit alert that an unauthorized actor was trying to access her account. *Id.* ¶155. These injuries all occurred shortly after the Data Breach, and, taking Plaintiffs' allegations as true, support their negligence claim.

### C. The Economic Loss Rule Does Not Bar Plaintiffs' Damages Claim.

"The [economic loss rule] prohibits recovery of purely economic damages through a tort cause of action because '[a] breach of a duty which arises under the provisions of a contract between the parties must be redressed under the contract, and a tort action will not lie.'" *McKee v. Lincoln Nat'l Life Ins. Co.*, No. CV 0:21-0499-MGL, 2022 WL 2919049, at *4 (D.S.C. July 25, 2022) (quoting *Tommy L. Giffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995)). However, this Court recognizes exceptions to this rule. *Id.* Courts must ask not whether the damages are physical or economic, but "the source of the duty plaintiff claims the defendant owed." *Id.* When "there is a special relationship between the alleged tortfeasor and the injured party not arising in contract, the breach of that duty of care will support a tort action." *Id*. Furthermore, this Court recognizes, "[t]he breach of an industry standard may establish that a special duty outside of the contract exists, and thus prevent application of the economic loss rule." *Eaton Corp. v. Trane Carolina Plains,* 350 F. Supp. 2d 699, 702–03 (D.S.C. 2004).

Here, Plaintiffs have alleged a special relationship exists because entities like Defendant have an independent duty of care to protect its customer's PII from unauthorized disclosures, and thus the economic rule does not apply. *See e.g. In re Equifax, Inc.*, 362 F. Supp. 3d 1295, 1321 (N.D. Ga. 2019) (declining to apply the economic loss rule and holding the Defendants owed the Plaintiffs a duty of care to safeguard their personal information: "Therefore, since an independent duty existed, the economic loss rule does not apply."). Defendant is a credit union charged with protecting the PII provided as a requirement of doing business with its customers, and Plaintiffs

have sufficiently plead a special duty that arose outside any contractual privity, sufficient to survive a motion to dismiss. Specifically, Plaintiffs plead Defendant breached its duty to follow industry standards, FTC guidelines, and NIST Cybersecurity Framework Version 2.0. CCAC ¶¶175-180, 181-184, 199-210).

Furthermore, courts have recognized that alleging loss of time as harm, as Plaintiffs have here, renders the economic loss rule inapplicable. *See, e.g.,* CCAC ¶104, 105 ("To date, Plaintiff Chase has spent over 20 hours attempting to remedy the harms from the Data Breach."); *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019). Lastly, Defendant cites *Morgan v. Haley*, which is factually distinct to this case. No. 2012CP4007331, 2013 WL 8335566, at *3 (S.C. Com. Pl. Feb. 27, 2013). Unlike *Morgan*, where no misuse or harm was alleged, Plaintiffs here have alleged they suffered unauthorized activity and misuse of their data. CCAC ¶¶31-36, 47, 50, 79, 90, 93, 104, 107, 118, 121, 127, 135, 141, 155, 161, 215. Plaintiffs have sufficiently pled their negligence claim.

## VIII.   Plaintiffs Adequately State a Claim for Negligence *Per Se*

As Defendant correctly notes, Plaintiffs may maintain a negligence *per se* claim under South Carolina law and the FTCA if they allege that "the statute was designed to protect a particular individual or group of people and that they are members of that group." Mot. at 25 (quoting *Blackbaud*, 567 F. Supp. 3d at 685). With respect to whether the statute was designed to protect Plaintiffs, multiple courts have concluded the FTCA contains an implied cause of action for inadequate cybersecurity practices like those alleged here. *See J.R. v. Walgreens Boots All., Inc.*, 470 F. Supp. 3d 534, 555 (D.S.C. 2020) (citing *In re Equifax*, 362 F. Supp. 3d at 1327 (denying motion to dismiss the plaintiffs' negligence *per se* claim based on a violation of the FTCA because the complaint adequately pleaded a violation of the FTCA, that the plaintiffs were within the class

24

of persons that the statute intended to protect, and that the harm suffered is the kind that the statute meant to protect)); *Bans Pasta, LLC v. Mirko Franchising, LLC*, No. 7:13-cv-00360-JCT, 2014 WL 637762, at *13 (W.D. Va. Feb. 12, 2014) (same); *Blackbaud*, 567 F. Supp. 3d at 684 (citing *In re Marriott Int'l, Inc.*, 440 F. Supp. 3d at 481-82 (holding plaintiffs adequately pled negligence *per se* under Georgia law).

Defendant contends *Walgreens Boots* and *Blackbaud* support its position, but it does so by selectively quoting language from their holdings. *See* Mot. at 26. First, in *Walgreens Boots,* the court found a failure to state a negligence *per se* claim because the plaintiffs did not allege defendant's "cybersecurity practices are inadequate nor do they allege any attempt by a third-party hacker to access plaintiffs' PII." 470 F. Supp. 3d at 555. Here, Plaintiffs detail Defendant's inadequate cybersecurity practices, as well as access and exfiltration by third parties of Plaintiffs' sensitive personal information. *See* CCAC at ¶¶179-180, 221, 224-230. Accordingly, *Walgreens Boots* supports Plaintiffs' position.

Second, in *Blackbaud*, the plaintiffs vaguely alleged a duty under various statutes that were lumped together without any specificity as to the purpose or specific provisions of each statute and failed to "actually define or otherwise explain the parameters" of the group they alleged the FTCA was enacted to protect. 567 F. Supp. 3d at 685. Conversely, here, Plaintiffs' operative pleading outlines the applicable section of the FTCA, how it applies to Plaintiffs, that Plaintiffs are within the group of individuals sought to be protected from the type of harm proscribed by the FTCA, and Defendant's inadequate practices that resulted in violations of the FTCA. *See* CCAC at ¶¶175-180, 220-224. Accordingly, this Court should hold the FTCA can serve as the predicate for negligence *per se* claims under South Carolina law and deny the motion to dismiss this claim.

## IX.    Plaintiffs Sufficiently Allege Breach of Implied Contract.

"A contract is an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct." *Stanley Smith & Sons v. Limestone Coll.*, 322 S.E.2d 474, 477 (S.C. Ct. App. 1984) (citations omitted). "If agreement is manifested by words, the contract is said to be express. If it is manifested by conduct, it is said to be implied." *Id*. For an implied contract to be created, "[t]he parties must manifest their mutual assent to all essential terms of the contract in order for an enforceable obligation to exist." *Id*.

Here, as alleged in the Consolidated Complaint, in order to receive banking and financial services from SRP, Plaintiffs were required to provide it with substantial amounts of highly sensitive personal information, including Social Security numbers. *See* CCAC ¶¶ 26, 31, 69, 83, 97, 111, 125, 139, 151, 235. SRP agreed, through its acceptance of the information and providing banking and financial services to Plaintiffs, to safeguard and protect this information from unauthorized viewing and access, thereby entering into an implied contract with Plaintiff and the Classes. *Id*. ¶¶ 27, 33, 237. Plaintiffs would not have entrusted such sensitive information to Defendant's care had they known Defendant did not have the data systems, practices, and protocols in place to keep it secure. *Id*. ¶ 240. Indeed, it would defy logic to suggest that providing something as sensitive as a Social Security number to an entity like Defendant would not imply that entity's assent to protect that information. *See, e.g.*, *Castillo v. Seagate Tech., LLC*, No. 16-cv-01958-RS, 2016 U.S. Dist. LEXIS 187428 at *29 (N.D. Cal. Sep. 14, 2016) (denying motion to dismiss breach of implied contract claim, observing: "[I]t is difficult to imagine how, in our day and age of data and identity theft, the mandatory receipt of Social Security numbers or other sensitive personal information would not imply the recipient's assent to protect the information sufficiently.").

Numerous courts analyzing breach of implied contract claims within the data breach context have found allegations similar to those made by Plaintiffs here to be sufficient. *See, e.g.*,

26

*Ford v. Sandhills Medical Foundation, Inc.*, Case No. 4:21-cv-02307-SAL, Order at Dkt No. 64 (D.S.C. December 20, 2024) (denying motion to dismiss breach of implied contract claim and noting that the reasonable inference from allegations that class members entrusted the defendant with their sensitive information is that the defendant "agreed to take reasonable measures to safeguard [plaintiff] and the class's personal information"); *In re Brinker Data Incident Litig.*, 2020 WL 691848, at *4 ("The majority of federal courts have held that the existence of an implied contract to safeguard customers' data could reasonably be found to exist between a merchant and customer when a customer uses a payment card to purchase goods and services.").

Finally, as to Defendant's argument that Plaintiffs failed to allege the specific terms of the implied contracts at issue, it has been explained by the Supreme Court of South Carolina that dismissal of a plaintiff's claim for breach of implied contract on this basis alone is unwarranted at the pleading stage, as it raises questions of fact that are better determined in the discovery phase of the litigation. Indeed, "[i]t is for the jury to determine whether there was a contract and whether it was performed according to its terms." *See Johnston v. Brown*, 357 S.E.2d 450, 452 (S.C. 1987) (citing *Quality Concrete Products, Inc. v. Thomason*, 253 S.C. 579, 172 S.E.2d 297 (S.C.1970)).[5]

As such, and for the reasons set forth herein, Defendant's Motion should be denied.

## X.     South Carolina Data Breach Security Act

A claim brought under the South Carolina Data Breach Security Act ("SCDBA"), S.C. Code § 39-1-90, *et seq.*, requires a business in South Carolina "owning or licensing computerized

---

[5] Defendant cites to inapposite cases, *Walgreens* and *Prestwick Golf Club*. In *Walgreens*, which is *not* a data breach case, the plaintiffs were "unaware" of the defendant's alleged improper use of the information at issue, thus calling into question how the plaintiffs could ever have entered into an implied contract with the defendant related to such information. 470 F. Supp. 3d at 559. And in *Prestwick Golf Club, Inc. v. Prestwick Ltd. Partnership*, 503 S.E.2d 184, 187 (S.C. Ct. App. 1988), the contract at issue was a written scheduling agreement between the parties, not an implied contract based on conduct of the parties, as is the case here.

data or other data that includes personal identifying information" to notify South Carolina residents in the event of a data breach. S.C. Code Ann. § 39-1-90(A). Defendant states four of the seven Plaintiffs are not South Carolina residents and, therefore, cannot bring claims under the SCDBA. However, Count IV is correctly brought only on behalf of Plaintiffs Black, Allen, and Ortiz, who are South Carolina residents, and the South Carolina Subclass. *See* Complaint (Doc. 19) at p. 44.

Additionally, Defendant claims Plaintiffs' allegation that "SRP is a business that owns or licenses computerized data" is unsupported by pleaded facts of any kind. (Doc. 19) at p. 44. Defendant also asserts that "mere possession does not satisfy SCDBA's statutory requirements." (Doc. 19) at p. 31. However, the *Twombly* and *Iqbal* pleading standard does not require evidence to be set forth but rather requires only that a Complaint indicates a "sheer possibility" that a defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 570). Plaintiffs must set forth a claim that has "facial plausibility," allowing the Court to draw a "reasonable inference" that a defendant is liable for the misconduct alleged. *Id.*

In *Richard Dusterhoft et al. v. OneTouchPoint Corp.*, the court concluded plaintiffs sufficiently alleged the company's data ownership or licensing, as required by the SCDBA, when plaintiffs stated OneTouchPoint's interest in the data stemmed from its "contracts with its healthcare and health insurance provider clients." 2024 WL 4263762, at *20 (E.D. Wis. Sept. 23, 2024). OneTouchPoint, similar to SRP, cited only *Blackbaud*, which held that the complaint essentially contained only a "formulaic recitation of the elements," in violation of the Supreme Court's holding in *Twombly*, in support of its argument for dismissal. *See id.* (quoting *Twombly*, 550 U.S. at 545, 555); *Blackbaud*, 567 F.Supp.3d at 678.

In *Dusterhoft*, the Court held that plaintiffs did more, "if only just," than a mere recitation of the elements, and OneTouchPoint offered no support for its argument that plaintiffs' additional

allegations were insufficient. *Dusterhoft*, 2024 WL 4263762, at \*20. Here, Plaintiffs, similar to those in *Dusterhoft*, have brought forth sufficient allegations to create this "plausible inference" that SRP owned or licensed the data at issue. *Id.* Defendant fails to recognize the variety of pleaded facts provided in Plaintiffs' Complaint, including that "SRP accumulates highly private PII of its current and former customers who bank, borrow, and invest." Doc. 19 at ¶ 26. The Complaint also makes evident that "SRP collects and maintains customers' unencrypted PII in its computer systems." Doc. 19 at ¶ 32. Plaintiffs have plainly set forth not only Defendant's ownership and accumulation of the PII at issue, but also its requirement that SRP members must provide such PII and SRP's consistently utilization of its members' PII to facilitate its services. Therefore, Defendant's arguments are wrong, and Plaintiffs' SCDBA claims survive the Motion.

### XI. Plaintiffs Plausibly Allege Breach of Confidentiality Based on the Special Relationship Between a Credit Union and Its Members.

SRP's challenge to Plaintiffs' breach of confidentiality claim disregards the legal significance of the relationship it maintains with its members and rests on a narrow reading of South Carolina law. *First*, SRP mischaracterizes Plaintiffs' claim as an attempt to "manufacture" a fiduciary relationship. But Plaintiffs do not allege that the breach of confidentiality arises from a fiduciary duty; rather, it arises from the confidential nature of the relationship between a financial institution and its customer—particularly where the institution receives, stores, and is entrusted with highly sensitive personal and financial information, such as Social Security numbers, account numbers, and other nonpublic data.

*Second*, SRP's assertion that it is a credit union rather than a bank is a distinction without a difference. Any financial institution bears a fundamental obligation to protect the confidentiality of the sensitive personal and financial information its members entrust to it. South Carolina law recognizes that a duty of confidentiality may arise independently of a fiduciary relationship,

particularly where one party receives sensitive personal information under circumstances that reasonably create an expectation of privacy. *See McCormick v. England*, 328 S.C. 627, 494 S.E.2d 431 (S.C. Ct. App. 1997) (holding a physician may owe a duty of confidentiality to a patient even absent a statutory obligation or formal physician-patient privilege and recognizing the viability of a common-law duty grounded in the sensitivity of the information and the circumstances of its disclosure). The same principle applies here: SRP collected, stored, and was entrusted with highly sensitive personal and financial PII in the context of a relationship that, by its nature, required discretion and care. That relationship gives rise to a legally cognizable duty of confidentiality.

*Third,* SRP's status as a financial institution brings with it obligations under both common law and statutory frameworks to protect customer information. These obligations are reinforced by industry standards and reflected in federal legislation, such as the Gramm-Leach-Bliley Act for which the National Credit Union Administration adopted Security Guidelines (12 CFR Part 748). While not directly alleged here, that action and Security Guidelines underscore the baseline expectation of privacy and confidentiality in the handling of consumer financial data. That expectation is fundamental to the relationship between financial institutions and their customers— and it is particularly critical in the context of a data breach, where the institution's failure to implement reasonable safeguards results in widespread exposure of sensitive information.

*Fourth*, Plaintiffs have adequately pled the elements of this claim. The Complaint alleges SRP received confidential, nonpublic information from Plaintiffs and Class Members; was under a duty to protect that information, and SRP disclosed it to unauthorized third parties without consent. *See* CCAC ¶¶ 253–257. These allegations, taken as true, are sufficient under *Twombly* and *Iqbal* to state a plausible claim for relief.

*Finally,* SRP's reliance on *Regions Bank v. Schmauch*, 354 S.C. 648, 582 S.E.2d 432 (S.C.

Ct. App. 2003), is wrong. That case addressed whether a fiduciary duty arose in the context of a lending relationship between a bank and a loan guarantor; it did not concern claims based on the unauthorized disclosure of PII. Plaintiffs do not assert a fiduciary theory, nor do they allege SRP acted as a financial advisor or loan fiduciary. Rather, Plaintiffs allege SRP improperly disclosed sensitive PII it was obligated to keep confidential—an independent claim under South Carolina law. Accordingly, the Court should find the breach of confidentiality claim is well pled.

**XII.     Plaintiffs Adequately Plead a Breach of Fiduciary Duty.**

"A fiduciary relationship exists when one reposes special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing confidence." *O'Shea v. Lesser*, 308 S.C. 10, 15 (1992). Even Defendant concedes that in certain situations, a bank can be held to a fiduciary duty "if it undertakes to advise a depositor as part of services the bank offers," MTD at 31 (citing *Regions Bank v. Schmauch*, 582 S.E.2d 432, 444 (S.C. Ct. App. 2003)).

Plaintiffs allege SRP offers a wide range of products and services through their wholesale and consumer businesses, including "consumer and small business banking, commercial banking, corporate and investment banking, wealth management, payments, and specialized lending businesses." CCAC ¶ 25. These types of financial services—including wealth management and investment banking—are inherently grounded in trust and the exercise of discretion.

As part of SRP's services, Plaintiffs and Class Members were required to entrust SRP with highly sensitive personal and financial data. (CAC ¶¶ 2, 31). SRP not only collected and stored this data but also assumed control over its protection, creating a relationship of dependence, discretion, and vulnerability sufficient to give rise to a fiduciary duty under South Carolina law. *See Burwell v. South Carolina National Bank*, 288 S.C. 34, 41, 340 S.E.2d 786, 790 (1986) ("The

31

facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party."). Accordingly, Plaintiffs have adequately alleged a fiduciary relationship based on SRP's role as custodian of their sensitive information and its obligation to safeguard it. Plaintiffs also sufficiently allege breach of that fiduciary duty and cognizable damages for reasons explained in earlier sections of the response. Thus, the Motion should be denied.

**XIII.    Plaintiffs Sufficiently Alleged a Claim for Unjust Enrichment.**

Plaintiffs provided their PII, money to be held in trust, and payments to SRP in the context of SRP's provision of banking and other financial services to Plaintiffs. *See* CCAC, at ¶¶ 68, 82, 96, 110, 124, 138. SRP retains these tangible benefits in service to its banking and financial service operations. This transfer is predicated on the idea that SRP will maintain the confidentiality of Plaintiffs' PII. When the transferred PII was released to the hacker, Plaintiffs suffered additional economic loss in the transaction, while SRP unjustly retained the full value of the transaction.

As such, Plaintiffs meet the three requirements for an unjust enrichment claim under South Carolina law: "(1) [a] benefit conferred by plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value." *Myrtle Beach Hosp., Inc. v. City of Myrtle Beach*, 341 S.C. 1, 532 S.E.2d 868, 872 (S.C. 2000). Moreover, "the benefit conferred by plaintiff upon the defendant" is a "good or services," in the form of money conveyed and fees paid. *See Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*, 385 S.C. 452, 467 (S.C. 2009) ("quantum meruit requires a showing of actual damages resulting from the wrongful retention of benefits (goods or services) by the defendant.").

SRP relies on *Walgreens Boots*, in which the defendant gathered PII and PHI from patients

to input it into a database and the plaintiff alleged that the transfer of the *information itself* into the database was a data breach and the source of the claims. 470 F. Supp. 3d at 544. Thus, the court held there was no transfer of goods that constituted a benefit. 470 F. Supp. 3d at 562-63. Moreover, plaintiffs "provide[d] their PII to Walgreens' pharmacy for the intended purposes of obtaining, and allowing Walgreen's pharmacy to seek third-party payment for, their individual prescriptions. . ." *J.R. v. Walgreens Boots Alliance, Inc.*, No. 20-1767, 2021 WL 4859603, at *7 (4th Cir. Oct. 19. 2021). Unlike here, *Walgreens Boots* had no allegation plaintiffs received anything other than what they were anticipating from their interaction with Walgreens, whereas here, Plaintiffs allege they did not receive the data security that they paid for through their transactions with SRP.

### XIV.   The Georgia Plaintiffs Sufficiently Plead a Claim for Litigation Expenses Pursuant to O.C.G.A. § 13-6-11.

Georgia law provides that litigation expenses and attorney fees may be awarded pursuant to O.C.G.A. § 13-6-11, "if the factfinder determines the defendant acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." *Whittaker Farms, LLC v. Fitzgerald Fruit Farms, LLC*, 819 S.E.2d 666, 672 (Ga. App. 2018) (citation omitted). "The question of attorney fees under OCGA § 13-6-11 is a question for the jury." *Id.* Thus, it would be premature for the court to dismiss the Georgia Plaintiffs' claims at this early stage of the litigation. *See Roy v. Morris*, No. 22-cv-3927, 2024 WL 2785317, at *5 (N.D. Ga. Feb. 14, 2024) ("summary judgment on [plaintiff's] claim for attorneys' fees would be premature given that other claims asserted by [plaintiff] against [defendant]"). To be entitled to litigation expenses and attorney fees, a plaintiff is only required to "show any one of these three conditions exists." *City of Gainesville v. Waters*, 574 S.E.2d 638, 644 (Ga. App. 2002) (citations omitted).

Defendant fails to address two published cases involving data breaches which dictate that the Court deny Defendant's Motion. In *Miller v. NextGen Healthcare, Inc.*, 742 F. Supp. 3d 1304,

(N.D. Ga. 2024), the court denied defendant's motion to dismiss when plaintiffs alleged that defendant "knew of severe deficiencies in their cybersecurity, and of serious threats, but nonetheless declined to act." *Id.* at 1318–19. Since the plaintiffs successfully alleged a breach of fiduciary duty claim, *id.* at 1317, the court concluded that the "allegations plausibly state a claim for litigation expenses premised on bad faith under O.C.G.A. § 13-6-11.5." *Id. at* 1318–19.

Likewise, in *In re Equifax*, the court declined to dismiss plaintiffs' claim for litigation expenses under O.C.G.A. § 13-6-11 when "plaintiffs have alleged that the defendants knew of severe deficiencies in [its] cybersecurity, and of serious threats, but nonetheless declined to act." 362 F. Supp. 3d at 1345. Plaintiffs successfully asserted claims for negligence because the "criminal conduct was reasonably foreseeable" to defendant. *Id.* at 1321. The court concluded "plaintiffs have alleged facts supporting bad faith" and denied defendants' motion to dismiss their claims pursuant to O.C.G.A. § 13-6-11. *Id.* at 1345. Plaintiffs here similarly allege Defendant should have been aware it was an attractive target for cybercriminals and should have enacted additional data security protocols, and its failure to do so led directly to the Data Breach. Thus, Plaintiffs have demonstrated viable claims and are entitled to present evidence of Defendant's bad faith and stubborn litigiousness to the jury. The cases upon which Defendant relies fail to support its argument. *Ellis v. Gallof*, 469 S.E.2d 288, 289 (Ga. Ct. App. 1996), merely states "the correct principle is that plaintiffs must prevail on their basic cause of action in order to obtain litigation expenses under OCGA § 13–6–11." (cleaned up). Likewise, *Peeples v. Caroline Container, LLC*, No. 19-cv-00021, 2019 WL 12338071, at *7 (N.D. Ga. Apr. 4, 2019) is inapplicable in that it involves the court's finding that "plaintiff's negligence arguments are without merit, which forecloses any finding of bad faith, stubborn litigiousness, or unnecessary expense." Here, Plaintiffs anticipate they will prevail on multiple substantive causes of action. In

*Powell Co. v. McGarey Grp., LLC*, 508 F. Supp. 2d 1202, 1220 (N.D. Ga. 2007), the court found "no basis to send plaintiff's fraud claim to the jury" and denied "plaintiff's claim for attorney's fees on this particular ground." Here, this case is still in its preliminary stages. *Powell* reinforces Plaintiffs' contention that it is premature to dismiss their O.C.G.A. § 13-6-11 claims at this early stage.  In *Backus Cadillac-Pontiac, Inc. v. Brown*, 365 S.E.2d 540, 541 (Ga. Ct. App. 1988), the defendant appealed a jury verdict in plaintiffs' favor of awarding $1,800 in damages and $1,500 in attorney fees. The court noted "the evidence does not authorize a finding by the jury that the defense of the action brought caused plaintiffs unnecessary trouble and expense or that defendant was being stubbornly litigious." *Id.* Here, there has been no evidence presented to any fact finder which would support dismissing Plaintiffs' claims pursuant to O.C.G.A. § 13-6-11. Thus, Defendant's Motion should be denied.

### XV.     Conclusion

Wherefore, Plaintiffs respectfully request that this Court deny Defendant's Motion to Compel, or in the alternative, Defendant's Motion to Dismiss in its entirety.

Dated: June 24, 2025,                     Respectfully Submitted,


                                          */s/  Paul Doolittle*_____
                                          Paul J. Doolittle, Esq. (S.C. Fed. ID No. 6012)
                                          POULIN | WILLEY ANASTOPOULO, LLC
                                          32 Ann Street
                                          Charleston, SC 29403
                                          Tel: 803-222-2222
                                          Fax: 843-494-5536
                                          Email: paul.doolittle@poulinwilley.com

                                          Gary M. Klinger*
                                          MILBERG COLEMAN BRYSON
                                          PHILLIPS GROSSMAN, PLLC
                                          227 W. Monroe Street, Suite 2100
                                          Chicago, IL 60606
                                          Phone: 866.252.0878

Email: gklinger@milberg.com

CHESTNUT CAMBRONNE PA
Bryan L. Bleichner*
Philip J. Krzeski*
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Phone: (612) 339-7300
Fax: (612) 336-2940
Email: bbleichner@chestnutcambronne.com
Email: pkrzeski@chestnutcambronne.com

*Attorneys for Plaintiff Allen*

*/s/ Karolan Ohanesian*
Karolan Ohanesian (S.C. Fed ID 6056)
Glenn V. Ohanesian (S.C. Fed ID 5317)
OHANESIAN LAW FIRM
P.O. Box 2433
Myrtle Beach, SC 29578
Phone: 843-626-7193
Fax: 843-492-5164
Email: OhanesianLawFirm@cs.com

Raina Borrelli (*pro hac vice*)
STRAUSS BORRELLI PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

*Attorneys for Plaintiff Black*

*/s/ Paul Doolittle*
Paul Doolittle (S.C. Fed. ID No. 6012)
POULIN | WILLEY | ANASTOPOULO, LLC
32 Ann Street
Charleston, SC 29403
T: (803) 222-2222
F: (843) 494-5536
pauld@akimlawfirm.com

N. Nickolas Jackson (pro hac vice forthcoming)
THE FINLEY FIRM, P.C.
3355 Lenox Road, N.E., Suite 750

36

Atlanta, GA 30326
Phone: (706) 928-9920
njackson@thefinleyfirm.com

*Attorneys for Plaintiff Whitfield*

*/s/ Paul Doolittle*_____
Paul J. Doolittle, Esq. (S.C. Fed. ID No. 6012)
POULIN | WILLEY ANASTOPOULO, LLC
32 Ann Street
Charleston, SC 29403
Tel: 803-222-2222
Fax: 843-494-5536
Email: paul.doolittle@poulinwilley.com

Terence R. Coates (pro hac vice forthcoming)
MARKOVITS, STOCK & DEMARCO, LLC
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Phone: (513) 651-3700
Fax: (513) 665-0219
tcoates@msdlegal.com

*Attorneys for Plaintiff Frierson*

*/s/ B. Tyler Brooks*_____
B. Tyler Brooks (S.C. Federal ID No. 12100)
LAW OFFICE OF B. TYLER BROOKS, PLLC
P.O. Box 10767
Greensboro, NC 27404
(336) 707-8855
Fax: (336) 900-6535
btb@btylerbrookslawyer.com

A. Brooke Murphy (pro hac vice forthcoming)
MURPHY LAW FIRM
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
T: (405) 389-4989
E: abm@murphylegalfirm.com

*Attorneys for Plaintiff Pound*

*/s/ B. Tyler Brooks*_____
B. Tyler Brooks (S.C. Federal ID No. 12100)
LAW OFFICE OF B. TYLER BROOKS, PLLC

37

P.O. Box 10767
Greensboro, North Carolina 27404
Tel: (336) 707-8855
Fax: (336) 900-6535
E: btb@btylerbrookslawyer.com

Tyler J. Bean (Pro Hac Vice forthcoming)
SIRI & GLIMSTAD LLP
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com

*Attorneys for Plaintiff Cummings*

*/s/ Ryan P .Duffy*
Ryan P. Duffy (S.C. Fed. ID No. 13520)
THE LAW OFFICE OF RYAN P. DUFFY
1213 W. Morehead St., Suite 500, Unit #450
Charlotte, NC 28208
Phone: (704) 741-9399
Email: rduffy@ryanpduffy.com

Manuel S. Hiraldo*
HIRALDO P.A.
 401 E Las Olas Blvd., Suite 1400
Ft. Lauderdale, FL 33301
Phone: (954) 400-4713
Email: mhiraldo@hiraldolaw.com

Michael Eisenband
EISENBAND LAW, P.A.
515 E Las Olas Blvd., Suite 120
Ft. Lauderdale, FL 33301
Phone: (954) 732-2792
Email: meisenband@eisenbandlaw.com

*Attorneys for Plaintiff Oscar Ortiz*

*/s/ Ryan P .Duffy*
Ryan P. Duffy (S.C. Fed. ID No. 13520)
THE LAW OFFICE OF RYAN P. DUFFY
1213 W. Morehead St., Suite 500, Unit #450
Charlotte, NC 28208
Phone: (704) 741-9399
Email: rduffy@ryanpduffy.com

38

Jeff Ostrow*
KOPELOWITZ OSTROW P.A.
One W Las Olas Blvd., Suite 500
Ft. Lauderdale, FL 33301
Phone: (954) 525- 4100
Email: ostrow@kolawyers.com

*Attorneys for Plaintiff Rosemary Ortiz*

*/s/ Paul Doolittle*
Paul J. Doolittle, Esq. (S.C. Fed. ID No. 6012)
POULIN | WILLEY ANASTOPOULO, LLC
32 Ann Street
Charleston, SC 29403
Tel: 803-222-2222
Fax: 843-494-5536
Email: paul.doolittle@poulinwilley.com
cmad@poulinwilley.com

Sabita Soneji
soneji@tzleagal.com
David W. Lawler
dlawler@tzlegal.com
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW
Suite 1010
Washington, D.C. 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

*Attorneys for Plaintiff Cerrato*

*/s/ Karolan Ohanesian*
Karolan Ohanesian (S.C. Fed ID 6056)
Glenn V. Ohanesian (S.C. Fed ID 5317)
OHANESIAN LAW FIRM
P.O. Box 2433
Myrtle Beach, SC 29578
Phone: 843-626-7193
Fax: 843-492-5164
Email: OhanesianLawFirm@cs.com

Mark Svensson*
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor

39

New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: msvensson@zlk.com

*Attorneys for Plaintiff Theresa McGrier*

*/s/ David A. Maxfield*
David A. Maxfield (S.C. Fed. ID No. 6293)
SOCO80808 Building 808 D Lady Street
Columbia, SC 29201
Tel: (803) 509-6800
Fax: (855) 299-1656
Email: dave@consumerlawsc.com

BRONSTEIN, GEWIRTZ& GROSSMAN,LLC
Michael J. Boyle, Jr. (pro hac vice to be filed)
4200 Regent Street, Suite 200
Columbus, OH 43219
Tel: (614) 578-5582
Email: mboyle@bgandg.com

Peretz Bronstein (pro hac vice to be filed)
60 East 42nd Street, Suite 4600
NewYork, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com

*Attorneys for Plaintiff Dunn*

*/s/ Paul Doolittle*_____
Paul J. Doolittle, Esq. (S.C. Fed. ID No. 6012)
POULIN | WILLEY ANASTOPOULO, LLC
32 Ann Street
Charleston, SC 29403
Tel: 803-222-2222
Fax: 843-494-5536
Email: paul.doolittle@poulinwilley.com
cmad@poulinwilley.com

Marc H. Edelson*
EDELSON LECHTZIN LLP
411 S. State Street, Suite N300
Newtown, PA 18940
Phone: (215) 867-2399

40

Email: medelson@edelson-law.com

*Attorneys for Plaintiff Chase*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on June 24, 2025 the foregoing document was filed via the Court's CM/ECF system, which will cause a true and correct copy of the same to be served electronically on all registered counsel of record.

<u>*/s/* Paul J. Doolittle</u>
Paul J. Doolittle, Esq.
